## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **P&G AUDITORS AND CONSULTANTS, LLC d/b/a P&G ASSOCIATES,**<br><br>Plaintiff,<br><br>v.<br><br>**MEGA INTERNATIONAL COMMERCIAL BANK CO., LTD.,**<br><br>Defendant. | Civil No. 18-9232<br><br>**COMPLAINT**<br>**AND**<br>**JURY DEMAND** |

P&G Auditors and Consultants, LLC d/b/a P&G Associates ("P&G"), by way of Complaint against the defendant, Mega International Commercial Bank Co., Ltd. ("Mega"), says:

### PARTIES

1.      P&G is a New Jersey limited liability company with a principal place of business located at 646 Highway 18, East Brunswick, New Jersey 08816.

2.      Mega is a foreign bank organized under the laws of the Republic of China (Taiwan) with a principal place of business in Taipei, Taiwan.

3.      Mega also maintains a foreign branch licensed by the New York Department of Financial Services located at 65 Liberty Street, New York, New York, 10005 ("NY Branch").

### JURISDICTION

4.      Jurisdiction exists under 28 U.S.C. §1332 by virtue of diversity of citizenship.

5.      Specifically, P&G is a citizen of the State of New Jersey, its State of formation and headquarters, and the State of citizenship of its sole member Amit Govil. Alternatively, Govil is a citizen of the State of New York. Mega is a citizen of the Republic of China (Taiwan), the nation under whose laws it was formed and its main office is located.

6.     As detailed below, the amount at issue exceeds $75,000.00, exclusive of interest and costs.

## VENUE

7.     Venue is proper in this District under 28 U.S.C. §1392 because a substantial part of the events giving rise to plaintiff's claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

8.     P&G entered into a contract to provide Mega with internal auditing services at the NY Branch pursuant to a letter agreement dated June 29, 2016 ("Agreement").

9.     The Agreement provided for three consecutive twelve-month engagement periods, with the first period ("First Period") commencing on July 1, 2016, the second period ("Second Period") commencing on July 1, 2017, and the third period ("Third Period") commencing on July 1, 2018.

**Failure To Pay Additional Fees During The First Period**

10.    The Agreement provided for a base fee of $199,966 per engagement period.  The fee was calculated based upon a budgeted estimate (based on information provided by Mega) of the hours that P&G would incur per period.  If the total number of hours to be worked exceeded 15% above the original budgeted amount (the "15% Cushion"), P&G, upon Mega's consent, could perform the additional work and Mega would pay for the additional time incurred. Although the Agreement was silent as to the hourly rate for the additional time, Mega and P&G later agreed in an Addendum to the Agreement dated November 27, 2017 ("Addendum") on a rate of $150 per hour for related services, demonstrating a consensus on the fair hourly value for P&G's services.

11.    During the First Period, P&G repeatedly advised Mega of the ongoing scope of work required, which was substantially in excess of the original estimate.   Mega (a) expressed its willingness to have P&G perform the additional services, (b) consented to that extra work, (c)

2

observed the additional work being performed, largely in Mega's own offices, and (d) accepted the services rendered by P&G.

12.     A total of 5,128.58 hours were actually worked by P&G in the First Period, compared to 2,461.34 hours originally budgeted. After deducting the 15% Cushion, Mega is responsible to pay P&G for 2,298.09 hours, for a total due (unpaid as to the First Period) of $344,713.50 at the fair hourly value of $150 per hour.

**Wrongful Termination of the Second Period**

13.     Because of the larger-than-expected scope of the work, in the Addendum the parties agreed to increase P&G's fees to $441,066 period, plus additional hourly amounts for "Validation Services" expressly set at $150 per hour, for the Second Period.

14.     The Agreement's Termination section provided in pertinent part:

Either Party may terminate this Engagement Agreement or terminate one or more Engagement Periods; however, (a) neither Party may terminate an Engagement Period which already commenced, and (b) neither Party may terminate any future Engagement Period… without first giving the other party at least ninety (90) days advance written notice prior to the start of such Engagement Period.

15.     By operation of law, the ninety-day notice of termination provision was 'of the essence' to the Agreement.

16.     The Second Period commenced on July 1, 2017. Notice to terminate the Second Period, to be effective, would have had to be given by April 3, 2017, which did not occur.

17.     Despite the unambiguously-restricted termination provision in the Agreement (as aforesaid), Mega sent an improper notice to terminate the Agreement ("Notice") on March 19, 2018, well into the Second Period, and wrongfully ceased making payments to P&G including cessation of the Second Period payments. Because the Notice did not comply with the terms of the Agreement, it was ineffective, and the Agreement remained in place.

18.     Of the $441,066 in base fees agreed to for the Second Period, Mega paid P&G only $323,401, leaving a balance due of $117,665; which, as a matter of law, should be paid in full by Mega, if only because (a) that amount constitutes the balance due of the specific minimum flat fee Mega agreed to pay, and (b) P&G had staffed to meet the contractual needs.

19.     The improper termination also prevented P&G from completing the Validation Services for the Second Period. P&G was denied the opportunity to perform $115,000 (until the end of the Second Period) in estimated gross billings ($766.67 hours at $150 per hour) beyond what had been billed prior to the improper termination.

**Ineffective Termination of the Third Period**

20.     The Notice could potentially have had some effect on the Third Period.  However, after issuing the Notice, Mega subsequently advised P&G that Mega desired to continue working with P&G. This communication had the effect of countermanding any effect the Notice might otherwise have had on terminating the Third Period.

21.     No timely notice was given to terminate the Third Period (i.e., more than ninety days before the beginning of the Third Period); therefore, the Third Period was never validly terminated, and remained a compensable portion of the agreement.

22.     Mega's failure to honor its obligations to continue P&G's services during the Third Period deprived P&G of earning profits of $163,194 for its auditing services and $55,500 for its validation services for the Third Period.

**Damage to P&G's Reputation**

23.     In addition to P&G, Mega also had other consultants performing services at the NY Branch, including Navigant Consulting, Inc. ("Navigant").

24.     Unbeknownst to P&G, and intentionally concealed by Mega from P&G even while P&G was still performing audit work for Mega, (a) Mega caused Navigant to perform a review and

assessment of P&G's work; (b) Mega fraudulently (i) obtained P&G's workpapers and (ii) shared them with Navigant, all as detailed below; (c) Navigant's assessment included statements that Mega was aware were untrue, misleading, highly negative and unfair towards P&G, as Mega well knew in light of P&G's high-quality work and herculean efforts to rescue Mega from an extraordinary and well-publicized 'mess' Mega had created, improperly blaming P&G where same was unwarranted, (collectively, the "Statements"); (d) those Statements were arrived at without providing P&G with an opportunity to provide input; and (e) Mega decided to, and did, publish those Statements not only to (i) the New York Department of Financial Services ("NYDFS"), the state agency which regulates banks doing business in New York, including regulating foreign bank branches such as the NY Branch, but also directly to (ii) banks who were P&G's customers and potential customers.

25.     Mega must have had a reasonable expectation that the Statements were likely to (a) be republished more widely by virtue of what was said and where and to whom it was being said, and (b) tarnish P&G's reputation.  Once again, P&G was not provided an opportunity to provide input as to the Statements.

26.     NYDFS issued a report concerning Mega on December 18, 2017 ("NYDFS Report"). P&G knows that the false statements were communicated by Mega to NYDFS after a meeting between P&G and NYDFS on October 20, 2017, because those issues were not mentioned during a lengthy three hour meeting on October 20, 2017 between P&G and NYDFS.

27.     As a result of the Statements Mega had maliciously communicated to NYDFS, the NYDFS Report was critical of P&G's audit work, and included the following false Statements (inter alia), falsely portraying P&G as a slipshod company, which Mega had relayed to NYDFS:

        a.     P&G did not customize its audit programs.

        b.     P&G did not customize its audit reports.

        c.     P&G never received management input in making assignments of target dates.

28.     The false statements in the NYDFS Report, brought about by Mega's publishing of defamatory Statements, (a) damaged P&G's business reputation, with the NYDFS itself, a regulatory agency with which P&G must often work closely; and (b) were made with a reasonable expectation of likely republication, in the banking community at large, including both P&G customers and potential customers, because it is well known that NYDFS criticisms of this sort become known in the industry.

29.     In any event, Mega maliciously published these knowingly false Statements directly to banks who were customers or potential customers of P&G, with a reasonable expectation of likely republication as well.  For example, on or around October 15, 2017, upon information and belief Mega maliciously communicated these false Statements to Hua Nan Bank-New York branch.  When P&G learned shortly thereafter that this vicious attack had undoubtedly occurred, and was told that P&G was being replaced on the engagement with that Bank, P&G was forced to resign from the engagement on October 20, 2017 rather than suffer reputational harm from being terminated.

30.     Upon information and belief, Mega also maliciously repeated these false Statements to other P&G's customers, thereby causing the loss to P&G of other customers and business.

31.     P&G was dramatically harmed as a result of all the foregoing.

### FIRST COUNT
### (Breach of Contract)

32.     P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

33.     Mega was bound to honor its obligations to P&G as detailed in the Agreement and the Addendum (jointly, the "Contract Documents").

34.     Mega breached its obligations by (a) failing to pay amounts due under the Contract Documents; (b) improperly preventing P&G from providing services agreed to under the Contract

Documents; (c) sending a termination notice that was impermissible under the Contract Documents; and (d) anticipatorily breaching its obligations as to the Third Period.

35.    Mega further breached its obligations by violating its duty under the Contract Documents to treat P&G's workpapers as confidential and proprietary.

36.    As a result of Mega's breaches of contract, P&G has suffered damages.

WHEREFORE, P&G demands judgment against Mega for the following relief:

      a.    Compensatory damages.

      b.    Consequential and incidental damages.

      c.    Costs, interest and attorneys' fees.

      d.    Such other and further relief as the Court deems equitable, appropriate and just.

**SECOND COUNT**
**(Breach of Covenant of Good Faith)**

37.    P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

38.    There is an implied covenant of good faith and fair dealing ("COGF") inherent in all contracts, including but not limited to the Agreement and the Addendum.

39.    The COGF includes an obligation not to frustrate the legitimate expectations of the other parties to receive the benefits of their bargain under the agreement, or to act in bad faith.

40.    Mega breached the COGF by (a) improperly purporting to terminate the Agreement, thereby depriving P&G of its expected benefit of the bargain; (b) obtaining P&G's most sensitive items under false pretenses and then secretly sharing same with P&G's competitor Navigant; (c) surreptitiously working behind P&G's back with its rival to subvert the contract and blame P&G without basis; and (d) intentionally acting to cost P&G business with other clients.

41.    P&G has suffered damages as a result of said breaches.

42.    Mega acted with actual malice in its conduct breaching the COGF.    Alternatively, Mega's conduct amounted to a wanton, willful, or reckless disregard of P&G's rights.

WHEREFORE, P&G demands judgment against Mega for the following relief:

      a.    Compensatory damages.

      b.    Consequential and incidental damages.

      c.    Punitive damages.

      d.    Costs, interest and attorneys' fees.

      e.    Such other and further relief as the Court deems equitable, appropriate and just.

## THIRD COUNT
### (Promissory Estoppel)

43.    P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

44.    Mega made clear and definite representations to P&G, upon which P&G reasonably relied to its detriment; thereby causing harm to P&G.

45.    Such representations included, but were not limited to, the promises in the Agreement and Addendum, including the representation (by virtue of Mega's countersignature) that it would treat P&G's workpapers as confidential and proprietary, which are (alternatively to the contract claim herein) enforceable under principles of promissory estoppel, if Mega claims that such contract is imperfect in some way in terms of enforceability.

46.    P&G has been damaged as a result of these breaches.

WHEREFORE, P&G demands judgment against Mega for the following relief:

      a.    Compensatory damages.

       b.      Consequential and incidental damages.

       c.      Costs, interest and attorneys' fees.

       d.      Such other and further relief as the Court deems equitable, appropriate and just.

## FOURTH COUNT
### (Quantum Meruit)

47.     P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

48.     P&G performed valuable services in good faith for Mega.

49.     Defendant accepted the services rendered by P&G.

50.     P&G reasonably expected to be compensated for the reasonable value of the services it rendered to Mega.

51.     Mega has failed to pay P&G its full entitlement.

52.     P&G has incurred damages as a result of Mega's failure to compensate P&G for the foregoing.

WHEREFORE, P&G demands judgment against Mega for the following relief:

       a.      Compensatory damages.

       b.      Consequential and incidental damages.

       c.      Costs, interest and attorneys' fees.

       d.      Such other and further relief as the Court deems equitable, appropriate and just.

## FIFTH COUNT
### (Unjust Enrichment)

53.     P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

54.    Mega received a benefit that was conferred by P&G.

55.    Retention of the benefit without payment to P&G would be unjust.

56.    P&G reasonably expected remuneration from Mega at the time P&G performed and/or conferred a benefit on Mega.

57.    Mega's failure to remunerate P&G has unfairly enriched Mega.

58.    P&G has incurred damages as a result of Mega's failure to remunerate P&G for benefits conferred.

WHEREFORE, P&G demands judgment against Mega for the following relief:

    a.    Compensatory damages.

    b.    Consequential and incidental damages.

    c.    Costs, interest and attorneys' fees.

    d.    Such other and further relief as the Court deems equitable, appropriate and just.

## SIXTH COUNT
### (Defamation)

59.    P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

60.    On or about October 15, 2017 and on multiple occasions thereafter, Mega maliciously and intentionally published and communicated false Statements regarding P&G's audit services, including to Hua-Nan Bank.

61.    Mega maliciously and intentionally published and communicated the false statements to NYDFS between October 21, 2017 and December 18, 2017.

62.     These false Statements were malicious, in that (from Mega's perspective) they were knowingly false or made in reckless disregard of the truth. Further, the false Statements were made with a reasonable expectation of likely republication.

63.     Mega's malicious conduct rendered the Statements outside any qualified privilege that may otherwise arguably have applied to the NYDFS communications, such as the qualified regulatory reporting privilege.   That privilege is not a license to destroy a party's reputation by means of malicious, false and defamatory statements to an agency in this context.

64.     P&G's business and business reputation were severely damaged as a result of Mega's false Statements.

WHEREFORE, P&G demands judgment against Mega for the following relief:

     a.     Compensatory damages.

     b.     Consequential and incidental damages.

     c.     Punitive damages.

     d.     Costs, interest and attorneys' fees.

     e.     Such other and further relief as the Court deems equitable, appropriate and just.

### SEVENTH COUNT
### (Breach of Confidentiality)

65.     P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

66.     An Agreement existed between P&G and Mega.

67.     Mega, as a signatory of the Agreement, (a) was expressly advised, and (b) agreed, that P&G's workpapers were "the property of P&G and constitute confidential information".   In this case, the workpapers included not just hard copy and electronic items, but also the most sensitive of

proprietary computer applications, as would have been obvious to Mega. Accordingly, due to the express confidentiality of the information P&G provided to Mega, Mega understood that the Agreement obligated Mega not to disclose confidential information.

68.    To obtain the workpapers, Mega misrepresented to P&G that Mega's own higher management wanted to see them.  Mega instead intended to and did disclose same to Navigant.

69.    Having accepted these materials on the basis of confidentiality, Mega had to duty not to violate that confidence by disclosing such workpapers, especially to P&G's competitor, Navigant.

70.    Mega breached its duty by making such disclosures.

71.    Mega's improper disclosures to Navigant of P&G's secret information and processes revealed in the workpapers constitute a breach of the Agreement, have damaged P&G; and are particularly harmful to P&G in the marketplace, in the hands of its larger competitor, Navigant.

WHEREFORE, P&G demands judgment against Mega for the following relief:

a.    Compensatory damages.

b.    Consequential and incidental damages.

c.    Punitive damages.

d.    Costs, interest and attorneys' fees.

e.    Such other and further relief as the Court deems equitable, appropriate and just.

### EIGHTH COUNT
### (Fraud)

72.    P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

73.    In 2017, Mega maliciously made intentional and material misrepresentations to P&G upon which P&G reasonably relied, to its detriment.

74.     More specifically, Mega represented to P&G that P&G's workpapers were needed for, and should be turned over to Mega for the purpose of being shown to, Mega's higher management.  In reality, the papers were obtained under false pretenses and were intended to be shown to Navigant, as they were.

75.     In this regard, on April 26, 2017, representatives of Mega with actual and apparent authority, including Marvin Chi Ying and Jessica Yu-Hui Lien from Mega's head office in China and Rose Hsu and Joy Lin from Mega's New York office, represented to P&G representatives Amit Govil and Joel Dunn at a meeting that workpapers being requested by Mega, in connection with the final audit report to be issued by P&G, were for review by Mega's head office.

76.     Consistent with this representation, Mega requested and obtained P&G's workpapers, including over twenty types of workpapers requested by Mega on June 29, 2017 in particular.  Upon information and belief, although Mega thus induced P&G to hand over its highly sensitive workpapers based on Mega's stated premise that they would be reviewed by Mega's head office, in reality no later than the time the workpapers were requested by Mega on June 29, 2017, Mega intended to show them to P&G's competitor Navigant and thus breach (a) Mega's own representation; and (b) P&G's proprietary rights in such papers, which were violated by disclosing them to P&G's competitor.

77.     P&G was hoodwinked, as Mega intended; gave over its highly sensitive information to Mega, which in turn gave same over to Navigant; and suffered substantial harm as a result.

78.     In the alternative, regardless of Mega's mens rea, Mega's material misrepresentations and P&G's justifiable reliance thereon entitle P&G to appropriate equitable relief on the grounds of equitable fraud.

WHEREFORE, P&G demands judgment against Mega for the following relief:

        a.      Compensatory damages.

b.     Consequential and incidental damages.

c.     Punitive damages.

d.     Equitable relief.

e.     Costs, interest and attorneys' fees.

f.     Such other and further relief as the Court deems equitable, appropriate and

just.

### NINTH COUNT
### (Tortious Interference with Contract)

76.     P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

77.     P&G had a valid contract with Hua Nan Bank and other contract 'partners' with whose contracts Mega interfered by its course of conduct set forth above.

78.     Mega had knowledge of P&G's contract with Hua Nan Bank and other contract 'partners'.

79.     Mega intentionally induced Hua Nan Bank and other contract 'partners' to breach their contracts with P&G.

80.     Mega maliciously interfered with those contractual relationships, causing Hua Nan Bank and other contract partners to breach their agreements with P&G.

81.     Hua Nan Bank and other contract 'partners' would not have breached their contracts with P&G absent Mega's malicious, intentional interference.

82.     The actions of Mega have thereby prevented P&G from achieving such pecuniary advantages, and have caused P&G severe financial harm and damages.

WHEREFORE, P&G demands judgment against Mega for the following relief:

a.     Compensatory damages.

    b.      Consequential and incidental damages.

    c.      Punitive damages.

    d.      Costs, interest and attorneys' fees.

    e.      Such other and further relief as the Court deems equitable, appropriate and just.

## TENTH COUNT
### (Tortious Interference with Pecuniary Advantage)

83.    P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

84.    P&G had strong business relations and prospects with Hua Nan Bank and other banking industry 'players'.

85.    Mega maliciously interfered with P&G's reasonable expectancy of pecuniary advantage from its past and potential relationships with its banking and other customers, based on P&G's years of developing a business and reputation within the banking industry.

86.    Mega also maliciously interfered with P&G's reasonable expectancy of pecuniary advantage from its proprietary processes as embodied in the workpapers.

87.    Mega used wrongful means and acted to maliciously interfere with P&G's business relations in order to harm P&G.

88.    Mega's misconduct maliciously caused injury to P&G's business relationships and prevented P&G from achieving pecuniary advantages that P&G would probably have realized; to P&G's severe detriment.

WHEREFORE, P&G demands judgment against Mega for the following relief:

    a.      Compensatory damages.

    b.      Consequential and incidental damages.

    c.      Punitive damages.

    d.      Costs, interest and attorneys' fees.

    e.      Such other and further relief as the Court deems equitable, appropriate and just.

**ELEVENTH COUNT**
**(Misappropriation of Trade Secrets)**

89.    P&G hereby repeats and realleges all the above allegations as if set forth at length herein.

90.    Mega knew that P&G's workpapers contained P&G's trade secrets; namely, the proprietary processes by which P&G performed its auditing processes.

91.    Mega obtained P&G's trade secrets through false pretenses, as described above.

92.    Mega misused P&G's trade secrets by disclosing same to P&G's competitor, Navigant.

93.    P&G was harmed as a result.

WHEREFORE, P&G demands judgment against Mega for the following relief:

    a.      Compensatory damages.

    b.      Consequential and incidental damages.

    c.      Punitive damages.

    d.      Costs, interest and attorneys' fees.

    e.      Such other and further relief as the Court deems equitable, appropriate and just.

## **JURY DEMAND**

Plaintiffs demand a trial by a jury on all counts, claims and issues so triable.


Dated:  New York, New York                WEINER LAW GROUP LLP
            October 9, 2018                      Attorneys for Plaintiff



                                                 By:    s/Clark E. Alpert, Esq.
                                                     Clark E. Alpert, Esq.
                                                     90 Broad St., 18th Fl.
                                                     New York, NY 10004-2627
                                                     Tel.: (646) 273-0275
                                                     calpert@weiner.law

1496404_1