**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

1585337_1

| | |
|---|---|
| **P&G AUDITORS AND CONSULTANTS, LLC d/b/a P&G ASSOCIATES,**<br><br>Plaintiff,<br>v.<br><br>**MEGA INTERNATIONAL COMMERCIAL BANK CO., LTD.,**<br><br>Defendant. | Civil No. 18-9232 |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Clark E. Alpert, Esq.
Paul S. Grossman, Esq.
**WEINER LAW GROUP LLP**
90 Broad St., 18th Fl.
New York, NY 10004-2627
Tel.: (646) 273-0275
calpert@weiner.law
Attorneys for Plaintiff P&G Auditors and Consultants, LLC d/b/a P&G Associates
Our File No. 22702

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES .... iii

PRELIMINARY STATEMENT .... 1

STATEMENT OF FACTS .... 2

ARGUMENT .... 5

POINT I

THE COURT SHOULD STRIKE THE DECLARATIONS AND OTHER MATERIAL .... 6

POINT II

PLAINTIFF SUCCESSFULLY PLEADED FACTS SETTING FORTH A BREACH OF CONTRACT CLAIM .... 8

POINT III

NEW YORK DOES RECOGNIZE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND P&G HAS PLEADED ONE HERE .... 10

POINT IV

P&G'S QUASI-CONTRACT CLAIMS ARE PLEADED IN THE ALTERNATIVE, AND APPLY ONLY IN THE EVENT THAT THE COURT ACCEPTS MEGA'S ARGUMENT THAT MEGA IS NOT CONTRACTUALLY REQUIRED TO PAY P&G FOR SERVICES RENDERED OR THAT P&G WAS PREPARED TO RENDER .... 11

POINT V

THE COMPLAINT PLEADS A DEFAMATION CLAIM AGAINST MEGA WITH SUFFICIENT SPECIFICITY TO MEET THE REQUIREMENTS OF FED. R. CIV. P. 8 .... 12

POINT VI

P&G HAS PROPERLY PLED A FRAUD CLAIM BECAUSE IT HAS PLEADED A DUTY INDEPENDENT FROM THE BREACH OF CONTRACT .... 14

POINT VII

PLAINTIFF HAS PLEADED ALL OF THE ELEMENTS OF TORTIOUS INTERFERENCE WITH CONTRACT AND WITH POTENTIAL ECONOMIC RELATIONS ........ 16

POINT VIII

MEGA FAILED TO BRIEF ITS MOTION FOR A MORE DEFINITE STATEMENT, AND THAT MOTION IS THEREFORE WAIVED........ 18

CONCLUSION........ 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

Agfa Corp. v. United Mktg. Group, Inc.,
No. 02 Civ. 8468, 2003 WL 21555087 (S.D.N.Y. Jul. 14, 2003) ........ 17

Akers v. Commissioner,
326 F. App'x 593 (2d Cir. 2009) ........ 7

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ........ 6

Baez v. Jetblue Airways Corp.,
No. 09-CV-596 (CPS)(SMG), 2009 WL 2447990 (E.D.N.Y. Aug. 3, 2009) ........ 13

Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,
692 F.3d 42 (2d Cir. 2012) ........ 15-16

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ........ 2, 5, 6

Berman v. Sugo LLC,
580 F. Supp. 2d 191 (S.D.N.Y. 2008) ........ 8

Betts v. Shearman,
No. 12 Civ. 3195 (JRO), 2013 WL 311124 (S.D.N.Y. 2013),
aff'd 751 F.3d 78 (2d Cir. 2014) ........ 6

Bonnell v. Carnival Corp,
No. 13-22265-CIV, 2014 WL 10979823 (S.D. Fla. Jan. 31, 2014) ........ 7

Clark-Fitzpatrick, Inc. v. Long Island R. Co.,
70 N.Y.2d 382 (1987) ........ 12, 15

Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.,
568 F. Supp. 2d 329 (S.D.N.Y. 2008) ........ 18

Difolco v. MSNBC Cable L.L.C.,
622 F.3d 104 (2d Cir. 2010) ........ 6

Dollar Phone Corp. v. Dun & Bradstreet Corp.,
No. 09-CV-3645 (ILG) (SMG), 2010 WL 5313737 (E.D.N.Y. Sept. 2, 2010) ........ 13

Eastern Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.,
307 F. Supp. 3d 52 (S.D.N.Y. 2018) ........ 6

Foros Advisors LLC v. Digitalglobe, Inc.,
333 F. Supp. 3d 354 (S.D.N.Y. 2018) ..... 12

Foster v. Churchill,
87 N.Y.2d 744 (1996) ..... 16-17

Geisler v. Petrocelli,
616 F.2d 636 (2d Cir. 1980) ..... 12

Gevorkyan v. Judelson,
No. 13 Civ. 8383 (RMB), 2015 WL 13158513 (S.D.N.Y. Sep. 30, 2015) ..... 19

Goel v. Bunge, Ltd.,
820 F.3d 554 (2d Cir. 2016) ..... 7

Goonan v. Federal Reserve Bank of N.Y.,
916 F. Supp. 2d 470 (S.D.N.Y. 2013) ..... 6

Guard-Life Corp. v. Parter Hardware Mfg Corp. (
50 NY2d 183) ..... 17

Houston Police Officers' Pension System v. State Global Advisors, Inc.
(In re State Street Bank & Trust Co, Fixed Income Funds Invs. Litig.),
2009 U.S. Dist. LEXIS 34967 (S.D.N.Y. April 8, 2009) ..... 7

IMG Universe, LLC v. Diamonds Int'l Corp., A.S.,
No. 17-CV-3673 (JPO), 2017 WL 479702 (S.D.N.Y. Oct. 23, 2017) (same) ..... 11

Kelly v. Schmidberger,
806 F.2d 44 (2d Cir. 1986) ..... 12

Kirch v. Liberty Media Corp.,
449 F.3d 388 (2d Cir. 2006) ..... 17, 17, 18

Knudsen v. Quebecor Printing
(U.S.A.), 792 F. Supp. 234 (S.D.N.Y. 1992) ..... 11

Kuhns v. Ledger,
202 F. Supp. 3d 433 (S.D.N.Y. 2016) ..... 17

Lama Holding Co., v. Smith Barney Inc.,
88 N.Y.2d 413 (1996) ..... 14

LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC,
10 F. Supp. 3d 504 (S.D.N.Y. 2014) ..... 6, 8

Liguori v. Alexander,
495 F. Supp. 641 (S.D.N.Y. 1980) ..... 13

Nabisco, Inc. v. Brach's Confections, Inc.,
No. 00 Civ. 5875 (AGS), 2000 WL 1677935 (S.D.N.Y. Nov. 6, 2000) ........ 19

National Wall-Paper Co. v. Sire,
37 A.D. 405 (1st Dept. 1899), rev'd. 163 N.Y. 122 (1900) ........ 9

NBT Bancorp v. Fleet/Norstar Fin. Group,
87 N.Y.2d 614 (1996) ........ 17

Orchard Hill Master Fund Ltd. v. SBA Communications Corp.,
830 F.3d 152 (2d Cir. 2016) ........ 8

Pasqualini v. Mortgageit, Inc.,
498 F. Supp.2d 659 (S.D.N.Y. 2007) ........ 13

Pirre v. Printing Developments, Inc.,
432 F. Supp. 840 (S.D.N.Y. 1977) ........ 12-13

Restis v. Am. Coalition Against Nuclear Iran, Inc.,
53 F. Supp. 3d 705 (S.D.N.Y. 2014) ........ 14

Rich v. New York C. & H. R. R. Co.,
87 N.Y. 382 (1882) ........ 15

Sterling Interiors Grp. v. Haworth, Inc., 94 Civ. 9216
(CSH), 1996 WL 426379 (S.D.N.Y. July 29, 1996) ........ 13

Touch Concepts v. Cellco P'ship,
949 F. Supp. 2d 447 (S.D.N.Y. 2013) ........ 10

Transcience Corp. v. Big Time Toys, LLC,
50 F. Supp. 3d 441 (S.D.N.Y. 2014) ........ 11

U.S. Bank N.A. v. BFPRU I, LLC,
230 F. Supp. 3d 253 (S.D.N.Y. 2017) ........ 11

United States v. Palestine Liberation Org.,
695 F. Supp. 1456 (S.D.N.Y. 1988) ........ 19

White Plains Hous. Auth. v. Getty Props. Corp.,
2014 WL 7183991 (S.D.N.Y. Dec. 162014) (S.D.N.Y. Dec. 16, 2014) ........ 7

Wolff v. Rare Medium, Inc.,
210 F. Supp. 2d 490 (S.D.N.Y. 2002) ........ 16, 17

Zahn v. Duhn,
133 F. Supp. 354 (D.D.C. 1955) ........ 9

**Rules**

Fed. R. Civ. P. 8 .......... 5, 12

## PRELIMINARY STATEMENT

Plaintiff P&G Auditors and Consultants LLC d/b/a P&G Associates ("P&G" or "Plaintiff") respectfully submits this Memorandum of Law in Opposition to defendant Mega International Commercial Bank Co., Ltd.'s ("Mega" or "Defendant") "Motion to Dismiss [the] Complaint and [for] other Reliefs" [sic].

Despite the hundreds of pages of affidavits and exhibits that Mega attempts to inject into this dispute at this stage (none of which have any place whatsoever in support of a motion made pursuant to Rule 12(b)(6)), Mega never denies the four most important facts in this entire dispute: it signed the Agreement, it received the services described in the Complaint, it knew it was receiving those services because they occurred in its very own offices, and it never paid for those services. (This goes beyond whether these facts are well pleaded; Defendant appears to concede the facts themselves.) This case is not about, as Mega would have the court believe, P&G's desire to "rewrite" the parties' contract. Rather, it is about something much more basic: Mega's desire to get something for nothing.

Not surprisingly, the affidavits and exhibits that Mega has chosen to share with the Court present a very one-sided and incomplete view of the facts here. They could easily be rebutted. But since that is neither necessary nor helpful in the context of a Rule 12(b)(6) motion, we will not take the time to address Mega' voluminous materials. That can await Mega's inevitable (though foreseeably meritless) summary judgment motion.

Rather, as we demonstrate below, the Complaint in this action easily withstands a motion to dismiss. P&G has pled factual matters sufficient to support each and every element of each of its claims. That is all that is required, and all that is at issue now. Indeed, Defendant's Motion is not aimed at all of P&G's claims. It does not seek to dismiss the breach of contract claim with respect to the Second Period (as defined below) or the breach of confidentiality claim.

## STATEMENT OF FACTS

Under Rule 12(b)(6) and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554 (2007), the following well-pleaded facts must be taken as true for purposes of this Motion.

P&G entered into an agreement (the "Agreement") with Mega, a Taiwanese bank, on June 29, 2016, pursuant to which P&G would provide internal auditing services to Mega's New York branch (the "New York Branch"). (Complaint ¶ 8). The Agreement provided for three consecutive twelve-month engagement periods, with the first period (the "First Period") commencing on July 1, 2016, the second period (the "Second Period") commencing on July 1, 2017, and the third period commencing on July 1, 2018 (the "Third Period").

Failure to Pay Additional Fees During the First Period

The Agreement provided for a base fee of $199,966 per engagement period. The fee was calculated based upon a budgeted estimate (based on information provided by Mega) of the hours that P&G would incur per period. If the total number of hours to be worked exceeded 15% above the original budgeted amount (the "15% Cushion"), P&G, upon Mega's consent, could perform the additional work and Mega would pay for the additional time incurred. Although the Agreement was silent as to the hourly rate for the additional time, Mega and P&G later agreed in an addendum to the Agreement dated November 27, 2017 (the "Addendum") on a rate of $150 per hour for related services, demonstrating a consensus on the fair hourly value for P&G's services. (Complaint ¶ 10).

During the First Period, P&G repeatedly advised Mega of the ongoing scope of work required, which was substantially in excess of the original estimate. Mega (a) expressed its willingness to have P&G perform the additional services, (b) consented to that extra work, (c) observed the additional work being performed, largely in Mega's own offices, and (d) accepted the services rendered by P&G. A total of 5,128.58 hours were actually worked by P&G in the

First Period, compared to 2,461.34 hours originally budgeted. After deducting the 15% Cushion, Mega is responsible to pay P&G for 2,298.09 hours, for a total due (unpaid as to the First Period) of $344,713.50 at the fair hourly value of $150 per hour. (Complaint ¶¶ 11-12).

Wrongful Termination of the Second Period

The Second Period commenced on July 1, 2017. Because of the larger-than-expected scope of the work, in the Addendum, the parties agreed to increase P&G's fees to $441,066 for the period, plus additional hourly amounts for "Validation Services" expressly set at $150 per hour. (Complaint ¶¶ 13, 16).

The Agreement's Termination section provided in pertinent part:

> Either Party may terminate this Engagement Agreement or terminate one or more Engagement Periods; however, (a) neither Party may terminate an Engagement Period which already commenced, and (b) neither Party may terminate any future Engagement Period… without first giving the other party at least ninety (90) days advance written notice prior to the start of such Engagement Period.

(Complaint ¶ 14). Accordingly, in order to be effective, notice to terminate the Second Period would have had to be given by April 3, 2017.

The requirement that notice be given before the beginning of an Engagement Period was not simply for convenience. P&G needed to hire and dedicate staff to the assignment, and thus if Mega were allowed simply to cancel an Engagement Period after it had commenced, P&G would be left with considerable expense as a result of the downtime for its staff. (Complaint ¶ 18).

Nevertheless, despite the unambiguously clear termination provision in the Agreement, Mega sent an improper notice to terminate the Agreement (the "Notice") on March 19, 2018, well into the Second Period, and ceased making all payments to P&G. (Complaint ¶ 17 ). Because the Notice did not comply with the terms of the Agreement, it was ineffective, and the Agreement remained in place. Of the $441,066 in base fees agreed to for the Second Period, Mega paid P&G only $323,401, leaving a balance due of $117,665. The improper termination also prevented P&G

from completing the Validation Services for the Second Period. P&G was denied the opportunity to perform $115,000 (until the end of the Second Period) in estimated gross billings ($766.67 hours at $150 per hour) beyond what had been billed prior to the improper termination. (Complaint ¶ 19).

Ineffective Termination of the Third Period

Arguably, the Notice might have been effective to terminate the Third Period. However, it was withdrawn. After issuing the Notice, Mega advised P&G that Mega desired to continue working with P&G, which both legally and practically (in the sense that P&G had to continue to have dedicated staffing for the project) had the effect of countermanding any effect the Notice might otherwise have had on terminating the Third Period. (Complaint ¶¶ 20-21). Because no timely notice was given to terminate the Third Period (i.e., more than ninety days before the beginning of the Third Period), the Third Period was never validly terminated, and remained a compensable portion of the agreement. Mega's failure to honor its obligations to continue P&G's services during the Third Period deprived P&G of earning profits of $163,194 for its auditing services and $55,500 for its validation services for the Third Period. (Complaint ¶ 22).

Damage to P&G's Reputation

In addition, Mega fraudulently obtained P&G's workpapers by telling P&G that they were for Mega's head office in Taiwan and would be kept confidential. Instead, P&G provided those workpapers to P&G's competitor, Navigant Consulting, Inc. ("Navigant"), and asked Navigant to perform a "review and assessment" of P&G's work. (Complaint ¶¶ 23-24). As an unsurprising result of the fraud, given the fact that Navigant and P&G are competitors, Navigant's assessment included statements that were untrue, misleading, highly negative and unfair towards P&G, especially in light of the massive effort P&G had been required to undertake to rescue Mega from its well-publicized money laundering issues. Mega, who had closely monitored P&G's efforts,

was completely aware that these statements were untrue, misleading, highly negative, and unfair. (Complaint ¶ 24).

Without even providing Mega an opportunity to review or rebut the statements made by Navigant, Mega published those statements both to (i) the New York Department of Financial Services ("NYDFS"), the state agency which regulates banks doing business in New York, including regulating foreign bank branches such as the New York Branch, and to (ii) banks who were P&G's customers and potential customers. (Complaint ¶ 28). For example, on or around October 15, 2017, upon information and belief, Mega communicated these false Statements to another client of P&G's, the New York branch of Hua Nan Bank. Shortly thereafter, P&G learned that it was being replaced on the engagement with that Bank, and P&G was forced to resign rather than suffer reputational harm from being terminated. (Complaint ¶ 29).

NYDFS issued a report concerning Mega on December 18, 2017 ("NYDFS Report"). The NYDFS Report, which was based entirely on the false statements contained in Navigant's report (as republished by Mega to NYDFS), was critical of P&G's audit work, and stated falsely that P&G did not customize its audit programs or reports and that P&G never received management input in making assignments of target dates. (Complaint ¶¶ 26-27). This report further damaged P&G's reputation with other banks. Defendant's misconduct also damaged P&G's reputation with NYDFS, a regulatory agency with which P&G often works closely. (Complaint ¶ 28). P&G was dramatically harmed as a result of all the foregoing. (Complaint ¶¶ 28-31).

## ARGUMENT

Fed. R. Civ. P. 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); Twombly, 550 U.S. at 554. To survive a motion to dismiss, a complaint does not "need detailed factual allegations." Id. at 555. Rather, all that is required are allegations sufficient to allege that a claim for relief is "plausible on its face."

Id. at 570. A claim is "facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Goonan v. Federal Reserve Bank of N.Y., 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Further, when considering a motion to dismiss, although the Court may disregard "legal conclusions" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," Iqbal, 556 U.S. at 678, the Court must assume that all of the well-pleaded "allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 589. Here, the pleaded facts are all commonsensical, not doubtful.

## POINT I

## THE COURT SHOULD STRIKE THE DECLARATIONS AND OTHER MATERIAL EXTRANEOUS TO THE COMPLAINT SUBMITTED BY MEGA

It is the function of the Court on a motion to dismiss--despite what Defendant would have this Court believe--"'not to assay the weight of the evidence which might be offered in support'" of the complaint, but "'merely to assess the legal feasibility of the complaint.'" Eastern Materials Corp. v. Mitsubishi Plastics Composites Am., Inc., 307 F. Supp. 3d 52, 57 (S.D.N.Y. 2018) (quoting Difolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010)). In so doing, a court may consider "only a limited set of information" that includes "any written instrument attached [to the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC, 10 F. Supp. 3d 504, 509 (S.D.N.Y. 2014). See also Betts v. Shearman, No. 12 Civ. 3195 (JRO), 2013 WL 311124, at *3 (S.D.N.Y. 2013) (Oetken, J.) (declining to consider party declarations on 12(b)(6) motions, but considering two documents that were integral to the complaint), aff'd 751 F.3d 78 (2d Cir. 2014). As the Second Circuit explained, in reversing the trial court's consideration of documents outside the complaint on a 12(b)(6) motion:

> Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, we do not look beyond "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.

Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citations omitted).

Declarations and other documents purporting to set forth facts are clearly not amongst the limited materials that the Court may consider. That is especially so where, as here, the information submitted by Mega is not only incomplete, but is also heavily redacted for unexplained (and seeming inexplicable) reasons. See Akers v. Commissioner, 326 F. App'x 593, 594 (2d Cir. 2009) (finding "incomplete" documents with "unexplained redactions and alterations" to be not credible). Accordingly, this Court should refuse to consider these materials and strike them from the record. See, e.g., White Plains Hous. Auth. v. Getty Props. Corp., 2014 WL 7183991, *3 (S.D.N.Y. Dec. 16, 2014) (stating that "[t]he Court strikes the Hatcher Affidavit and all materials appended thereto because they are inappropriate for consideration under Rule 12(b)(6)"); Ahmed v. Purcell, No. 14 Civ. 7491, 2016 WL1064610, at *16 n.2 (S.D.N.Y. Mar. 14, 2016) (striking exhibits submitted on a motion to dismiss). [1]

---

[1] Indeed, redactions of this sort simply add another layer of inferences in the non-movant's favor. Cf. Houston Police Officers' Pension System v. State Global Advisors, Inc. (In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.), 2009 U.S. Dist. LEXIS 34967 (S.D.N.Y. April 8, 2009) at *6 (redacted discovery items) (stating that "such redactions are generally unwise. They breed suspicions, and they may deprive the reader of context") (no Westlaw citation available) (attached hereto); Bonnell v. Carnival Corp, No. 13-22265-CIV, 2014 WL 10979823, at *3 (S.D. Fla. Jan. 31, 2014) (redactions create "'suspicion that relevant material harmful to the producing party has been obscured' ") (quoting In re Medeva Sec. Litig., No. 93-4376-Kn(AJW), 1995 U.S. WL 943468, at *3 (C.D. Cal. May 30, 1995)).

## POINT II

## PLAINTIFF SUCCESSFULLY PLEADED FACTS SETTING FORTH A BREACH OF CONTRACT CLAIM

In order to successfully plead a breach of contract claim under New York law, P&G must allege only "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Orchard Hill Master Fund Ltd. v. SBA Communications Corp., 830 F.3d 152, 156 (2d Cir. 2016). There is no need "'for each element to be pleaded individually.'" LBBW Luxemburg S.A., 10 F. Supp. 3d at 513 (quoting Berman v. Sugo LLC, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008)). At this stage of the litigation, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." Orchard Hill Master Fund Ltd., 830 F.3d at 156.

P&G has easily met this burden here. P&G has pleaded that a contract was formed between P&G and Mega with very specific written terms, pursuant to which P&G would, among other things, perform consulting services for Mega and Mega would, among other things, pay for those services (see, e.g., Complaint ¶¶ 8-10, 13-16, 20); that it performed under that contract by performing the work required under that contract (see, e.g., Complaint ¶¶ 11-13, 16-18); that Mega breached the agreement by failing to pay for P&G's work, by purporting to terminate the contract in a way prohibited by that contract, and by disclosing Mega's confidential work papers to a competitor (see, e.g., Complaint ¶¶ 12, 17-18, 22, 24, 34); and that P&G was damaged by Mega's breach. (See, e.g., Complaint ¶¶ 12, 18-19, 22, 31, 36).

Mega argues, nevertheless, that it did not breach the agreement with respect to the First Period because the Agreement required payment only of a "fixed fee" and it allegedly paid that "fixed fee." (Memorandum of Law in Support of Defendant Mega International Commercial Bank Co., Ltd's [sic] Motion to Dismiss and for Other Relief ("Def. Mem.") at 12-13). But Mega simply ignores the part of the Agreement that reads:

> If substantial additional hours and work becomes necessary which are not covered under the Scope of Service, and due to the discovery of significant irregularities or impropriety, or the discovery of significant ineffective internal controls or regulatory issues, we will advise you promptly, explain[] the necessity of such hours and work, and obtain your permission to extend such work prior to commencing. It is agreed that additional hours and work will be considered substantial if the hours for such work exceeds fifteen (15%) of the budgeted hours as stipulated above.[2]

(Agreement at 15).[3] The evidence will show that that is exactly what happened here.

Relying exclusively on its termination notice--a document that was neither attached to the Complaint nor formed an integral part thereof--Mega argues that it effectively terminated the Third Period of the Agreement. (Def. Mem. at 13-15). Once again, however, Mega asks this Court to focus on statements from outside the Complaint, while completely ignoring the Complaint's actual factual allegations. The Complaint clearly alleges that "Mega subsequently advised P&G that Mega desired to continue working with P&G" and "this communication had the effect of countermanding any effect the Notice might otherwise have had on terminating the Third Period." (Complaint ¶ 20). Not only is this allegation consistent with the facts as they actually happened, but (just as importantly here) it is more than sufficient to satisfy Rule 8's notice-pleading requirement.

---

[2] The terms "consent" and "permission" are "synonymous." National Wall-Paper Co. v. Sire, 37 A.D. 405, 407 (1st Dept. 1899) (overturning trial court's finding of consent/permission), rev'd. 163 N.Y. 122 (1900) (reinstating trial court's finding of consent/permission). Any attempt to distinguish between the two terms would be "semantics." Zahn v. Duhn, 133 F. Supp. 354, 358 (D.D.C. 1955). The issue cursorily raised in defendant's Memorandum as to *writings* sufficient to constitute permission/consent under the contract (or "acceptance" as pleaded by plaintiff, see Complaint ¶11, which would include ratification by defendant of the work done) does not entail an element of the claim of breach of contract; but rather a factual issue (well within plaintiff's pleading of consent here), not a legal one.

[3] Although we did not attach a copy of the Agreement to the Complaint, we acknowledge that the Court may consider it (which is attached to defendant's papers), since it is integral to the Complaint. The same does not apply to the remainder of defendant's copious submission.

Finally, Mega does not dispute that it improperly terminated the Second Period or that the Complaint properly alleges a breach of contract claim with respect to that Period.[4]

## POINT III

## NEW YORK DOES RECOGNIZE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND P&G HAS PLEADED ONE HERE

Relying largely on truncated quotations, Mega argues that "New York does not recognize a separate cause of action for breach of [the] implied covenant of good faith." (Def. Mem. at 17). This is inaccurate, as even Mega eventually admits. (See Def. Mem. at 18). New York law most certainly recognizes a claim for breach of good faith and fair dealing:

> For all contracts, New York law imposes an implied covenant of good faith and fair dealing such that a party may be in breach of the duty even when it has abided by the express terms of the contract. The implied "covenant [of good faith and fair dealing] embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.

In Touch Concepts v. Cellco P'ship, 949 F. Supp. 2d 447, 466 (S.D.N.Y. 2013) (alteration in the original) (citations omitted).

While it is true, as Mega argues, that a breach of the implied covenant of good faith and fair dealing cannot "invoke[] the same contractual rights and obligations" (Def. Mem. at 18) as a breach of a contract claim, that is not the case here. The Complaint makes clear that Mega breached the covenant by, among other things, "surreptitiously working behind P&G's back with its rival to subvert the contract and blame P&G without basis." (Complaint, ¶ 40). That alone breaches the covenant of good faith and fair dealing.

---

[4] Mega also does not seek to dismiss P&G's Seventh Count for breach of the confidentiality agreement. (Complaint ¶¶65-71).

## POINT IV

## P&G'S QUASI-CONTRACT CLAIMS ARE PLEADED IN THE ALTERNATIVE, AND APPLY ONLY IN THE EVENT THAT THE COURT ACCEPTS MEGA'S ARGUMENT THAT MEGA IS NOT CONTRACTUALLY REQUIRED TO PAY P&G FOR SERVICES RENDERED OR THAT P&G WAS PREPARED TO RENDER

Mega argues that "quasi contract claims," such as P&G's third (Promissory Estoppel), fourth (Quantum Meruit), and fifth (Unjust Enrichment) claims for relief, should be dismissed because "the existence of the Engagement Agreement precludes" these claims. (Def. Mem. at 19). Mega is, of course, wrong. Quasi-contract claims and contract claims can co-exist at the pleading stage, either where they are pled in the alternative to contract claims or where there is a dispute about the scope or validity of the contract. As this Court has explained:

> [E]ven though Plaintiffs may not ultimately recover under the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to plead such claims in the alternative. A court may allow a breach of contract and unjust enrichment claim to proceed past the motion to dismiss stage when the validity or scope of the contract is difficult to determine.

U.S. Bank N.A. v. BFPRU I, LLC, 230 F. Supp. 3d 253, 266 (S.D.N.Y. 2017) (emphasis in original) (citations omitted). See also Knudsen v. Quebecor Printing (U.S.A.), 792 F. Supp. 234, 237 (S.D.N.Y. 1992) (denying motion to dismiss quantum meruit claims because they can be pled "alternatively" to contract, and because it is proper to dismiss quantum meruit claims "only when it is clear from the face of the complaint that there exists an express contract that clearly controls"); Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 452-53 (S.D.N.Y. 2014) (denying motion to dismiss as to unjust enrichment on the same grounds); IMG Universe, LLC v. Diamonds Int'l Corp., A.S., No. 17-CV-3673 (JPO), 2017 WL 479702, at *1-2 (S.D.N.Y. Oct. 23, 2017) (Oetken, J.) (same).

That is exactly the situation here. P&G's quasi-contract claims are pled in the alternative, meaning that it is not seeking overlapping recoveries for breach of contract. Mega contends (and

as the Complaint reflects, had contended pre-litigation) that it is not liable to P&G under the Agreement, despite the fact that P&G provided services that it has not been paid for and was prevented from providing other services, after considerable cost and expense, because of Mega's breach. The quasi-contract claims are meant to recover for these damages in the event (arguendo) that Mega turns out to be correct (or partially correct) that the Agreement does not require Mega to pay for them. Under these circumstances, the quasi-contract claims are pled entirely properly.[5]

## POINT V

## THE COMPLAINT PLEADS A DEFAMATION CLAIM AGAINST MEGA WITH SUFFICIENT SPECIFICITY TO MEET THE REQUIREMENTS OF FED. R. CIV. P. 8

As explained by the Second Circuit in Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986):

> [I]n federal diversity cases… "the mode of pleading defamation is governed by Rule 8, Fed. R. Civ. P." Geisler v. Petrocelli, 616 F.2d 636, 640 (2d Cir. 1980). Under Rule 8(e)(1), the standards for sufficiency of the pleadings are liberal. "Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." Id. . The test of a complaint's sufficiency is whether it is detailed and informative enough "to enable defendant to respond and to raise the defense of res judicata if appropriate." Geisler, 616 F.2d at 640. Complaints which do not plead the allegedly defamatory statements *in haec verba* have in the past been held sufficient. See Pirre v. Printing Developments, Inc., 432 F. Supp. 840, 843 (S.D.N.Y. 1977). The central concern is that the complaint "afford defendant sufficient notice of the communications complained of to enable him to defend himself."

Liguori v. Alexander, 495 F. Supp. 641, 647 (S.D.N.Y. 1980) (emphasis added).

---

5 The two cases relied upon by Mega are easily distinguishable. In Foros Advisors LLC v. Digitalglobe, Inc., 333 F. Supp. 3d 354, 365 (S.D.N.Y. 2018), the plaintiff was suing in quasi contract seeking to apply a pay rate set forth in an "offer letter" when there was an "engagement agreement" that completely controlled the pay for the engagement, and the quasi contract claim was pleaded "to renegotiate the [contract] rate." Id. at 366. Here, Mega is specifically contending that the Agreement does not apply to the work performed by P&G, and so (if that argument prevails) there is not a 'controlling agreement.' Similarly, in Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987), it was "undisputed that the relationship between the parties was defined by a written contract, fully detailing all applicable terms and conditions" (emphasis added). Again, that is not the case here, where Mega contends that the Agreement does not apply to work performed by P&G.

Although Mega cites District Court cases which state that it is necessary to identify the defendant's employee who made the defamatory statement, the Second Circuit has not adopted that as a requirement, and other courts have denied Rule 12(b)(6) motions on defamation claims where no employee was identified. See, e.g., Pasqualini v. Mortgageit, Inc., 498 F. Supp.2d 659, 672 (S.D.N.Y. 2007) (stating that "'[c]ontrary to defendants' arguments, the pleading need not allege the specific defamatory words, or the time, place, and speaker of each defamatory statement'") (citations omitted); Sterling Interiors Grp. v. Haworth, Inc., 94 Civ. 9216 (CSH), 1996 WL 426379, at *74 (S.D.N.Y. July 29, 1996) ("reject[ing] defendants' contention that plaintiff must allege the exact time, place and speaker of each defamatory statement" because "[t]hose are Rule 9(b), not Rule 8(a), requirements"); Dollar Phone Corp. v. Dun & Bradstreet Corp., No. 09-CV-3645 (ILG) (SMG), 2010 WL 5313737, at *6 (E.D.N.Y. Sept. 2, 2010) (allegation that corporate defendant knowingly published statements containing false information satisfied Rule 8); Baez, 2009 WL 2447990, at *9 (?COURT? ?MONTH? ?DAY?, 2009) ("[n]or must the complaint state the time, place and speaker of each defamatory statement, as those are Rule 9(b), not Rule 8(a) requirements") (internal quotations omitted). The cases cited by Mega are improperly applying the heightened pleading requirements followed in New York state courts, and not the Rule 8 standard as recognized in Kelly.

In the present case, the Complaint properly identifies (1) defamatory statements regarding P&G (P&G did not customize its audit programs or audit reports, and never received management input in making assignments of target dates. (¶27)); (2) publication to third parties (the New York Department of Financial Services ("NYDFS") (¶24) and Hua Nan Bank-New York branch (¶29)); (3) malice (Id. .); and (4) injury to P&G's business reputation ( ¶28), thus satisfying the requirements of a defamation claim under New York common law. Dollar Phone, 2010 WL 5313737 at *5.

Nor does the fact that Mega worked with another consultant, Navigant, in the creation of the defamatory statements limit defendant's liability. "Under New York law, all who take part in the procurement, composition and publication of a libel are responsible in law and equally so." Restis v. Am. Coalition Against Nuclear Iran, Inc., 53 F. Supp. 3d 705, 717 (S.D.N.Y. 2014) (citations omitted). Here, the Complaint states that (i) Mega improperly gave Navigant P&G's workpapers (¶24); (ii) Navigant made an assessment of P&G's work which Mega knew to be untrue (id.); and (iii) P&G published the false statements to NYDFS (id.) and to Hua Nan Bank (¶29). Mega was thus actively involved in the "procurement, composition and publication" of the defamatory material.

## POINT VI

## P&G HAS PROPERLY PLED A FRAUD CLAIM BECAUSE IT HAS PLEADED A DUTY INDEPENDENT FROM THE BREACH OF CONTRACT

In order to plead successfully a claim for fraud, P&G need only allege facts sufficient to establish "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other part on the misrepresentation or material omission, and [4] injury." Lama Holding Co., v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996). P&G has done exactly that here.

P&G has pleaded that "[o]n April 26, 2017, representatives of Mega with actual and apparent authority, including Marvin Chi Ying and Jessica Yu-Hui Lien from Mega's head office in China and Rose Hsu and Joy Lin from Mega's New York office, represented to P&G representatives Amit Govil and Joel Dunn at a meeting that workpapers being requested by Mega, in connection with the final audit report to be issued by P&G, were for review by Mega's head office." (Complaint, ¶ 75). Further, the Complaint alleges that "Mega thus induced P&G to hand over its highly sensitive workpapers based on Mega's stated premise that they would be reviewed

by Mega's head office." (Complaint ¶ 76). The truth, however, was that "in reality no later than the time the workpapers were requested by Mega . . . Mega intended to show them to P&G's competitor." (Complaint ¶ 76). Finally, the Complaint alleges, that as a result of having its highly sensitive information provided to a competitor, Mega was damaged. (Complaint ¶ 77). Thus, P&G pled each and every element of fraud.

Mega argues, nevertheless, in a single sentence, that P&G's fraud claim should be dismissed because "P&G has failed to show how its fraud claim arises from a legal duty separate from the Engagement Agreement or from a contractual right." (Def. Mem. at 23). It is true, of course, "that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, Inc., 70 N.Y.2d at 389 (1987) (relied upon by Mega). The mere fact that the parties have entered into a contract, however, does not excuse the failure to comply with separate legal duties, including those that arise out of common-law, as the New York Court of Appeals explained more than a century ago:

> It may be granted that an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. But such legal duty may arise, not merely out of certain relations of trust and confidence, inherent in the nature of the contract itself . . . , but may spring from extraneous circumstances, not constituting elements of the contract as such, although connected with and dependent upon it, and born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud.

Rich v. New York C. & H. R. R. Co., 87 N.Y. 382, 398 (1882) (emphasis added). See also Bayerische Landesbank v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 58 (2d Cir. 2012) (holding that where a "legal duty . . . spring[s] from circumstances extraneous to, and not constituting elements of, the contract" . . . "a plaintiff may maintain both tort and contract claims").

That is exactly the case here. The legal duty not to fraudulently induce another to provide sensitive information so that it may be turned over to a competitor is completely extraneous from, and exists entirely apart from, any duties that might arise under the Agreement. The breach of

contract centers on Mega's failure to pay for P&G's services, its improper termination of the agreement, and its provision of confidential materials to third parties (Complaint, ¶¶ 34-35), while the fraud centers on Mega's misrepresentation about the purpose for which it needed P&G's confidential work papers (Complaint ¶¶72-78). They are two separate and distinct duties and two separate and distinct claims.

## POINT VII

## PLAINTIFF HAS PLEADED ALL OF THE ELEMENTS OF TORTIOUS INTERFERENCE WITH CONTRACT AND WITH POTENTIAL ECONOMIC RELATIONS

It is basic tort law that there are two separate types of tortious interference claims. There is "tortious interference with contract," which requires one set of elements, and there is "tortious interference with prospective economic advantage," which requires a different set. P&G pled each separately in its Complaint. (Compare Complaint ¶¶ 76-82 with Complaint ¶¶ 83-88). Even the case upon which Mega principally relies, Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490 (S.D.N.Y. 2002), distinguishes between the two and sets forth the separate elements of each. Compare id. at 497-98 with id. at 500. Yet somehow, inexplicably, Mega conflates the two in its Memorandum.

Tortious interference with contract requires: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract (3) the defendant's intentional procuring of the breach, and (4) damages." Foster v. Churchill, 87 N.Y.2d 744, 749-50 (1996). See also Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (setting forth same elements); Kuhns v. Ledger, 202 F. Supp. 3d 433, 441 (S.D.N.Y. 2016) (same). It does not require, as Mega contends, "wrongful means"--that is an element of tortious interference with prospective economic advantage (although, as demonstrated below, P&G has pleaded that too). As the New York Court of Appeals explained:

> As the Court made clear in Guard-Life Corp. v. Parter Hardware Mfg Corp. (50 NY2d 183, 193), the degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior.

NBT Bancorp v. Fleet/Norstar Fin. Group, 87 N.Y.2d 614, 621 (1996) (emphasis added). See also Kirch, 449 F.3d at 401 (setting forth elements of both torts); Agfa Corp. v. United Mktg. Group, Inc., No. 02 Civ. 8468, 2003 WL 21555087, at *4 (S.D.N.Y. Jul. 14, 2003) (explaining the difference between the two torts by stating that "[t]o state a claim for tortious interference with prospective economic advantage, "'a plaintiff must also plead facts that demonstrate that the defendant used dishonest, unfair or improper or wrongful means"'") (citations omitted).[6]

P&G has pleaded factual support for each of the elements necessary to plead a claim of tortious interference with contractual relations. The Complaint alleges the existence of a valid contract between P&G and Hua Nan Bank and other contract partners (Complaint ¶¶ 29, 77); that Mega had knowledge of P&G's contract with Hua Nan Bank and other contract partners (which can also be inferred from the fact that they reached out to Hua Nan Bank at all) (Complaint ¶ 78); that Mega intentionally induced the breach of that contract by reporting false and misleading information about Mega based upon a report by a competitive consulting agency (Complaint ¶¶

---

[6] In Wolff, the case upon which Mega relies most heavily, the court set out the elements for tortious interference with contract without including the need to prove "wrongful means." 210 F. Supp. 2d at 497. It was not until after concluding that there was no contractual relationship (and therefore that a necessary element for the tort was missing), id. at 498, that the Court turned to the issue of whether "wrongful means" existed. Id. at 499. Accordingly, the most logical interpretation of Wolff is that the Court, having concluded that there was no contract, turned to the issue of "wrongful means" because that is a necessary element tortious interference with prospective economic advantage. To the extent that Wolff can be read to require "wrongful means" with respect to a claim for tortious interference with *contract*, it is not an accurate representation of New York law.

29, 80); and, lastly, that Mega was damaged by being forced to resign from the account. (Complaint ¶¶ 29, 82).

P&G has also pleaded factual support for each of the elements of tortious interference with prospective business relations. To plead this tort, a "plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch, 449 F.3d at 400. Dishonest, unfair, or improper means "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions" or acting "for the sole purpose of inflicting intentional harm on plaintiff." Darby Trading Inc. v. Shell Int'l Trading & Shipping Co., 568 F. Supp. 2d 329, 343 (S.D.N.Y. 2008) (emphasis added).

As demonstrated above, P&G clearly pled a business relation with a third party (Hua Nan Bank), Mega's interference in that relationship, and an injury. P&G also clearly pled that interference occurred through "dishonest" or "wrongful" means. Specifically, as discussed above, P&G pled that Mega fraudulently obtained P&G's workpapers and then misrepresented their contents to Hua Nan Bank and others. (See Complaint ¶¶ 23-29, 59-64, 72-78). P&G thus successfully pled all of the elements of this claim as well.

## POINT VIII

## MEGA FAILED TO BRIEF ITS MOTION FOR A MORE DEFINITE STATEMENT, AND THAT MOTION IS THEREFORE WAIVED

Mega states in its Notice of Motion that it is also moving for a more definite statement "pursuant to FRCP Rules 9 and 12(e)." Mega never briefed this motion, however, and therefore we have no idea, among other things, on what grounds it claims to be entitled to that relief or with respect to what portions of P&G's Complaint it believes it is entitled to a more definite statement.

Framing a response to the assertion in Defendant's Memorandum is thus impossible, as is a reasoned decision by this Court on that point.

Because Mega did not even bother to brief this motion, it is waived. See United States v. Palestine Liberation Org., 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988) (denying motion to dismiss "for lack of capacity" because motion was not briefed); Gevorkyan v. Judelson, No. 13 Civ. 8383 (RMB), 2015 WL 13158513, at *2 n.1 (S.D.N.Y. Sep. 30, 2015) (denying jurisdictional challenges that were not briefed because "[a]ny issue not briefed is considered abandoned, and is denied"); Nabisco, Inc., 2000 WL 1677935, at *5 n.3 (?COURT? ?MONTH? ?DAY?, 2000) (denying request to transfer to District of New Jersey because the parties had not briefed that issue).

## CONCLUSION

For the foregoing reasons, Defendant Mega's "Motion to Dismiss [the] Complaint and [for] Other Reliefs" should be denied in its entirety.

Dated: New York, New York
April 5, 2019

WEINER LAW GROUP LLP
Attorneys for Plaintiff

By: s/Clark E. Alpert, Esq.

Clark E. Alpert, Esq.
Paul S. Grossman, Esq.
90 Broad St., 18th Fl.
New York, NY 10004-2627
Tel.: (646) 273-0275
calpert@weiner.law

LexisNexis®

**User Name:** Paul Grossman

**Date and Time:** Friday, April 5, 2019 10:21:00 AM EDT

**Job Number:** 86385580

## Document (1)

1. *Houston Police Officers' Pension System v. State Global Advisors, Inc. (In re State Street Bank & Trust Co, Fixed Income Funds Invs. Litig.), 2009 U.S. Dist. LEXIS 34967*

**Client/Matter:** 22702

**Search Terms:** Houston Police Officers' Pension System v. State Global Advisors, Inc. (In re State Street Bank & Trust Co, Fixed Income Funds Invs. Litig.), 2009 U.S. Dist. LEXIS 34967 (S.D.N.Y. April 8, 2009) at *6

**Search Type:** Natural Language

**Narrowed by:**

| **Content Type** | **Narrowed by** |
|---|---|
| Cases | -None- |

Positive
As of: April 5, 2019 2:21 PM Z

# *Houston Police Officers' Pension System v. State Global Advisors, Inc. (In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.)*

United States District Court for the Southern District of New York

April 8, 2009, Decided; April 8, 2009, Filed

08 md 1945 (RJH) (DFE); 08 Civ. 0333 (RJH) (DFE)

**Reporter**
2009 U.S. Dist. LEXIS 34967 *

In re STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION; HOUSTON POLICE OFFICERS' PENSION SYSTEM, Plaintiff, - against - STATE STREET BANK AND TRUST CO. and STATE STREET GLOBAL ADVISORS, INC., Defendants.

**Subsequent History:** Request denied by *In re State St. Bank and Trust Co. Fixed Income Funds Inv. Litig., 2009 U.S. Dist. LEXIS 35001 (S.D.N.Y., Apr. 9, 2009)*

**Prior History:** *In re State St. Bank & Trust Co. Fixed Funds Inv. Litig., 2009 U.S. Dist. LEXIS 32621 (S.D.N.Y., Mar. 23, 2009)*

## Core Terms

redactions, documents, categories, attorneys

**Counsel:** **[*1]** For State Street Bank and Trust Co. Fixed Income Funds Investment Litigation, In Re, Defendant: Daniel J. Maher, LEAD ATTORNEY, Ropes & Gray LLP (MA), Boston, MA; Lila A. Palmer, LEAD ATTORNEY, PRO HAC VICE, Ropes & Gray LLP (MA), Boston, MA.

For Karen Adams, Nashua Corporation Pension Plan Committee and all other plans similarly situated, and participants thereof, Margaret Callan, Nashua Corporation Pension Plan Committee and all other plans similarly situated, and participants thereof, John L. Patenaude, Trustees of the Nashua Corporation Hourly Employees Retirement Plan, and all others similarly situated and participants thereof, Lead Plaintiffs: Avi Josefson, LEAD ATTORNEY, Bernstein Litowitz Berger & Grossmann LLP, New York, NY; Gretchen Freeman Cappio, LEAD ATTORNEY, Keller & Rohrback, LLP, Seattle, WA; Jeffrey Craig Block, LEAD ATTORNEY, Berman DeValerio (MA), Boston, MA; Kristen D. Tremble, LEAD ATTORNEY, PRO HAC VICE, Berman DeValerio Pease Tabacco Burt & Rucillo, Boston, MA; Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

For Trustee Warren Cohen, as Trustee of the Unisystems, Inc., Employee Profit Sharing Plan, Alan Kober, as members of **[*2]** the Nashua Corporation Pension Plan Committee, Lead Plaintiffs: Avi Josefson, LEAD ATTORNEY, Bernstein Litowitz Berger & Grossmann LLP, New York, NY; Gretchen Freeman Cappio, LEAD ATTORNEY, Keller & Rohrback, LLP, Seattle, WA; Jeffrey Craig Block, LEAD ATTORNEY, Berman DeValerio (MA), Boston, MA; Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

For Nashua Corporation Pension Plan Committee, Plaintiff: Jeffrey Craig Block, LEAD ATTORNEY, Berman DeValerio (MA), Boston, MA; Kristen D. Tremble, LEAD ATTORNEY, PRO HAC VICE, Berman DeValerio Pease Tabacco Burt & Rucillo, Boston, MA; Patrick T. Egan, LEAD ATTORNEY, PRO HAC VICE, Berman DeValerio (MA), Boston, MA; Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

For Ning Yu, Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund, Individually and On Behalf of All Others Similarly Situated, Plaintiffs: Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

For Memorial Hermann Health Care System, The Health Professionals Insurance Company, Ltd., Consolidated Plaintiffs: Charles R. Parker, LEAD ATTORNEY, Locke Lord Bissell & Liddell, **[*3]** LLP, Houston, TX; John Robert Nelson, LEAD ATTORNEY, Locke Lord Bissell & Liddell, LLP (TX), Dallas, TX.

For Houston Police Officers Pension System, Consolidated Plaintiff: Tracy D. Larson, Gibbs & Bruns L.L.P, Houston, TX.

For SSGA Funds, Mark E. Swanson, Defendants: John D. Donovan, Jr., LEAD ATTORNEY, Ropes & Gray LLP (MA), Boston, MA.

For Lynn L. Anderson, William L. Marshall, Steven J. Mastrovich, Patrick J. Riley, Richard D. Shirk, Bruce D. Taber, Henry W. Todd, Defendants: Thomas James Dougherty, LEAD ATTORNEY, Skadden, Arps, Slate, Meagher & Flom LLP (MA), Boston, MA.

For ING Institutional Plan Services LLC, formerly known as CitiStreet, LLC, Defendant: Lewis Richard Clayton, LEAD ATTORNEY, Aliza Jordana Balog, Jonathan Hillel Hurwitz, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY.

For Anatoly Alexander, Movant: Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

**Judges:** DOUGLAS F. EATON, United States Magistrate Judge.

**Opinion by:** DOUGLAS F. EATON

## Opinion

MEMORANDUM AND ORDER

DOUGLAS F. EATON, United States Magistrate Judge.

In today's Memorandum and Order, I shall discuss the joint letter dated April 1, 2009 from Mr. Burford on behalf of plaintiff Houston Police **[*4]** Officers' Pension System ("HPOPS") and from Mr. Skinner on behalf of defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (collectively, "State Street"). The letter came with a large box of exhibits.

**1. HPOPS's practice of redacting a portion of a document on the ground that the portion is non-responsive and irrelevant.**

In a letter dated February 17, 2009, a different attorney who also represents HPOPS wrote: "[R]edacted documents in the production are not included on the privilege log because generally we redacted documents to remove non-responsive materials, as opposed to privileged information." (Exh. C.)

State Street cites *Howell v. City of New York, 2007 U.S. Dist. LEXIS 71063, 2007 WL 2815738, *2 (E.D.N.Y. Sept. 25, 2007)*, in which Magistrate Judge Pohorelsky wrote: "It is not the practice of this court to permit parties to selectively excise from otherwise discoverable documents those portions that they deem not to be relevant." On the other hand, HPOPS quotes the following passage from *Spano v. Boeing Co., 2008 U.S. Dist. LEXIS 31306, 2008 WL 1774460, *2 (S.D. Ill. Apr. 16, 2008)*:

> The Court also rejects Plaintiffs' argument that redaction is an improper method of challenging the relevance of a document. **[*5]** Although not specifically addressed in the Rule, other courts have found redaction appropriate where the information redacted was not relevant to the issues in the case. *See* ... *Schiller v. City of New York, 2006 U.S. Dist. LEXIS 88854, 2006 WL 3592547 at *7 (S.D.N.Y. Dec. 7, 2006)* (upholding redaction of portion of meeting minutes not relevant to issues in a case). ...

In *Schiller 2006 U.S. Dist. LEXIS 88854, [WL] at *6*, Magistrate Judge Francis allowed a group that organized a protest march to redact the names of its members. *2006 U.S. Dist. LEXIS 88854, [WL] at *7-8* he discussed several other redactions based on lack of relevance; he allowed some and disallowed others, taking pains to make careful distinctions. That judicial effort was necessary because the group invoked free speech rights against government attorneys, and hence the dispute could not be solved by simply designating the unredacted minutes for "attorneys'-eyes-only." See *2006 U.S. Dist. LEXIS 88854, [WL] at *5, n. 5*; see also *The New York Times Co. v. Gonzales, 459 F.3d 160, 170 (2d Cir. 2006)* (free press rights).

**In the case at bar, the stipulated protective order makes it unnecessary to redact any portion of a document on the ground that the portion is non-responsive and irrelevant. In all the cases embraced under 08 and 1945, I direct each party, and [*6] each subpoenaed non-party, not to make any such redaction after April 8, 2009**. In my view, such redactions are generally unwise. They breed suspicions, and they may deprive the reader of context. *Rule 26(b)(1)* says that information is relevant as long as it "appears reasonably calculated to lead to the discovery of admissible evidence."

I now consider what to do about such redactions that were made prior to April 9, 2009. On the present record, State Street fails to persuade me that I should compel HPOPS to unredact all of its tedious busywork. State Street's one specific complaint is quite strained; it writes

at page 2:

> ... A comparison ... with a non-redacted version ... located elsewhere in HPOPS's production shows [as follows:] One of the redacted portions from the board minutes [of HPOPS says]: "Mr. Olson advised that the number of retirements is picking up. So far this calendar year there have been 37 retirements. There are also approximately 250 more members eligible for DROP entry this year, so there may be an increase in the number of retirements."

State Street fancies that this shows "HPOPS's need for greater investment returns in its portfolio -- and thus its appetite for risk ...."

I **[*7]** rule that State Street may use the following protocol to challenge pre-4/9/09 redactions that appear to be made solely on the ground of non-responsiveness or irrelevance. At any time, State Street may specify three redacted documents and serve HPOPS with a demand that HPOPS submit those documents to me for an *in camera* ruling. HPOPS must submit them to me unless, within three business days, it has shown State Street the full text of at least one of the documents. At this point, State Street will have two options: (a) demand that HPOPS submit any remaining one or two documents to me immediately, or (b) engage in successive rounds of specification and prompt response until State Street chooses to demand that HPOPS send me one, two or three of the documents still in dispute. At that juncture, I will rule on the *in camera* examples, and I may order HPOPS to unwind all such redactions, and I may award attorneys fees against HPOPS or against State Street.

The same protocol may be used by any party that has a dispute with any party or subpoenaed non-party about similar redactions made on or before April 8, 2009.

**2. The extent to which HPOPS must provide documents concerning its investments in [*8] commodities, fixed income or cash fund strategies.**

In the 4/1/09 joint letter, starting at page 7, second paragraph, line 8, HPOPS sets forth in detail the discovery that it has provided and/or commits that it will provide concerning its investments in the above strategies, even where State Street was not involved. I find that this commitment will give State Street everything it is entitled to receive from HPOPS concerning this category. At page 8, State Street's reply addresses only one portion of HPOPS's commitment. In a footnote, State Street says: "HPOPS has since agreed to revise its search terms, and we understand that, at some point in the future, HPOPS will produce all marketing or promotional materials, client presentations, articles and the like concerning asset-backed and mortgage-backed securities and derivatives."

**3. HPOPS's list of ten categories as to which it asks State Street to produce ten separate rou s of documents or to identify ten separate sets of Bates-number-ranges.**

The ten categories are spelled out by HPOPS at pages 10-13 of the 4/1/09 joint letter. State Street does not give a response specific to any of the ten categories. At the top of page 14, it says: "State **[*9]** Street has also provided detailed indices of its production, indicating by Bates range the custodian or other source file of the documents. These features ... allow the plaintiffs to focus on those custodians and document categories of most relevance to their case ...." I believe, although I am not sure, that this is a sufficient response to Category # 5, which lists the names of 28 custodians.

On the other hand, I find that State Street has not given an adequate response to the other nine categories. Mr. Skinner sends me Exhibit G, which consists of 19 letters sent by him to the attorneys representing various plaintiffs. But he does not show me how these letters enable HPOPS to find the documents pertaining to the nine categories. The first paragraph of HPOPS's reply, at pages 15-16, seems to be accurate when it says: "For example, nowhere in the cover letters is there a category listed that would enable HPOPS to determine where the monthly holding for CMY1 would be located. [See Category # 1] .... Likewise, there is no category in the cover letters identifying where HPOPS can locate the information it needs to determine what holdings were liquidated or redeemed-in-kind to the participants **[*10]** of the CMY1 Fund or [to] the [other] State-Street-managed funds that owned units of CMY1. [See Categories # 6 and # 7]"

I agree with State Street that "[a] central goal of multi-district litigation is efficiency through consolidated discovery." But I find that HPOPS has shown good cause why State Street should give a separate, tailored response to each of Categories # 1 through # 10. A few of those Categories may be worded too broadly, but State Street's remedy is to meet and confer with HPOPS. In the words of my Standing Order for Discovery Disputes, the attorneys must "make a genuine effort to resolve the dispute by determining,

without regard to technical interpretation of the language of a request, (a) what the requesting party is actually seeking, (b) what the discovering party is reasonably capable of producing that is responsive to the request, and (c) what specific genuine issues, if any, cannot be resolved without judicial intervention."

/s/ Douglas F. Eaton

DOUGLAS F. EATON

United States Magistrate Judge

500 Pearl Street, Room 1360

New York, New York 10007

Telephone: (212) 805-6175

Fax: (212) 805-6181fax

Dated: New York, New York

April 8, 2009

---

End of Document