UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

P&G AUDITORS AND
CONSULTANTS, LLC, *d/b/a P&G
Associates*,
                      Plaintiff,

             -v-

MEGA INTERNATIONAL
COMMERCIAL BANK CO., LTD.,
                      Defendant.

18-CV-9232 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiff P&G Auditors and Consultants, LLC ("P&G") brings this action against Defendant Mega International Commercial Bank, Co., Ltd. ("Mega"), in connection with auditing work P&G performed for Mega beginning in 2016. Invoking this Court's diversity jurisdiction, P&G asserts claims for breach of contract, unjust enrichment, quantum meruit, promissory estoppel, breach of the implied covenant of good faith and fair dealing, breach of confidentiality, fraud, tortious interference with contract, tortious interference with pecuniary advantage, defamation, and misappropriation of trade secrets. Mega moves to dismiss most of the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for a more definite statement pursuant to Rule 12(e). P&G moves to strike certain of Mega's filings. For the reasons that follow, the motion to dismiss is granted in part and denied in part, the motion for a more definite statement is denied, and the motions to strike are denied as moot.

## I. Background

### A. Factual Background

The following facts are taken from the allegations in the complaint, as well as documents attached thereto or referenced therein, and are assumed true for the purposes of this motion.

P&G is a New Jersey limited liability company that provides internal auditing services. (Dkt. No. 1 ("Compl.") ¶¶ 1, 8.) On June 29, 2016, P&G and Mega, a foreign bank, entered into a letter agreement (the "Agreement") under which P&G agreed to provide its auditing services to Mega in three consecutive twelve-month engagements. (Compl. ¶¶ 2, 9.) The "First Period" was to run from July 1, 2016, the "Second Period" from July 1, 2017, and the "Third Period" from July 1, 2018. (Compl. ¶ 9.)

Under the terms of the Agreement, Mega committed to pay a flat fee of $199,966 per engagement period. (Compl. ¶ 10; Dkt. No. 19-3 ("Agmt") at 15.) That fee was based on an estimate of the hours P&G would work to complete the auditing services during that period. (Compl. ¶ 10; Agmt at 15.) But if "substantial additional hours and work bec[ame] necessary," P&G agreed to "advise [Mega] promptly, explain[] the necessity of such hours and work, and obtain [Mega's] permission to extend such work prior to commencing." (Agmt at 15.) Additional hours were defined as substantial "if the hours for such work exceeds fifteen (15%) of the budgeted hours." (*Id*.) For the First Period, the Agreement budgeted 2,461.34 hours. (Compl. ¶ 12.) The Agreement's Termination section provided, in part:

> Either Party may terminate this Engagement Agreement or terminate one or more Engagement Periods; however, (a) neither Party may terminate an Engagement Period which already commenced, and (b) neither Party may terminate any future Engagement Period . . . without first giving the other party at least ninety (90) days advance written notice prior to the start of such engagement period.

(Compl. ¶ 14; *see also* Agmt at 16.)

P&G alleges that during the First Period, P&G repeatedly alerted Mega that the ongoing work would require hours substantially in excess of the original estimate. (Compl. ¶ 11.) In response, P&G alleges, "Mega (a) expressed its willingness to have P&G perform the additional services, (b) consented to that extra work, (c) observed the additional work being performed, largely in Mega's own offices, and (d) accepted the services rendered by P&G." (*Id.*)

P&G ultimately performed 5,128.58 hours of work in the First Period. (Compl. ¶ 12.) P&G claims that Mega is liable for the difference between the hours worked and the hours budgeted, less the 15% cushion, a calculation that amounts to approximately 2,298 hours for which P&G claims it did not receive payment. (*Id.*)

To adjust to the larger-than-expected scope of work, the parties executed an Addendum that increased P&G's flat fee for the Second Period to $441,066, as well as adding an $150-an-hour fee for "Validation Services." (Compl. ¶ 13.) The Second Period began July 1, 2017. (Compl. ¶ 16.) On March 19, 2018, well into the Second Period, Mega notified P&G that it was terminating the Agreement and ceased making payments to P&G. (Compl. ¶ 17.) Thereafter, Mega paid P&G $323,401 — $117,665 less than the base fee quoted in the Addendum. (Compl. ¶ 18.) P&G alleges that the termination of the Second Period also deprived P&G of the opportunity to do an estimated 766.67 additional hours of Validation Services at $150 per hour. (Compl. ¶ 19.)

Some time after issuing the March 19, 2018 notice, Mega allegedly "advised P&G that Mega desired to continue working with P&G," termination of the Second Period notwithstanding. (Compl. ¶ 20.) No other notice, P&G alleges, was communicated to terminate the Third Period. (Compl. ¶ 21.) P&G did not receive payment for the Third Period. (*See* Compl. ¶ 22.)

3

During the relevant periods, Mega also employed other consultants to perform services at Mega's New York branch. (Compl. ¶ 23.) P&G alleges that Mega covertly engaged Navigant Consulting, Inc. to perform an assessment and review of P&G's work, tricked P&G into disclosing its "workpapers," and shared the papers with Navigant, an ostensible competitor. (Compl. ¶ 24.) Navigant's assessment, P&G claims, included statements about P&G's work that Mega knew to be untrue, yet Mega nonetheless disseminated the assessment to the New York Department of Financial Services ("NYDFS") and current and potential customers of P&G. (*Id.*) Consequently, NYDFS issued a report on Mega in December 2017. (Compl. ¶ 26.) The report stated that "P&G did not customize its audit programs . . . , P&G did not customize its audit reports . . . , [and] P&G never received management input in making assignments of target dates." (Compl. ¶ 27.) On October 15, 2017, Mega communicated those statements to Hua Nan Bank–New York Branch, a client of P&G. (Compl. ¶ 29.) Shortly thereafter, P&G was informed by Hua Nan Bank that it was being replaced on that engagement. (*Id.*)

**B.    Procedural History**

P&G filed the complaint on October 9, 2018, asserting eleven causes of action. (*See* Compl. ¶¶ 32–93.) The motions to dismiss and for a more definite statement — which attack only some of the asserted claims — followed on February 26, 2019. (*See* Dkt. No. 18.)

**C.    Legal Standard**

**1.    Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court assessing such a motion must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50

4

(2d Cir. 2006) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)). In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court may "look[ ] only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken." *Rhee-Karn v. Burnett*, No. 13 Civ. 6132, 2014 WL 4494126, at *3 (S.D.N.Y. Sept. 12, 2014). "On a motion to dismiss for breach of contract, courts look . . . at the contract itself, which by definition is integral to the complaint." *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017).

Rule 9(b) creates a heightened pleading standard for claims alleging fraud or mistake, requiring that the party alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To survive a motion to dismiss on such a claim, the party alleging fraud must "(1) specify the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 251–52 (S.D.N.Y. 2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

### 2. Motion for a More Definite Statement

Federal Rule of Civil Procedure 12(e) allows a party to "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). A Rule 12(e) motion is appropriate in narrow circumstances, namely, where a pleading is "sufficiently intelligible for the district court to make out one or more potentially viable legal theories on which the claimant might proceed" — thus precluding dismissal under Rule 12(b)(6) — but where the pleading is "so vague or ambiguous that the opposing party cannot respond to it . . . with a pleading that can be interposed in good faith or without prejudice to himself." *Pelman ex*

5

*rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 443 (S.D.N.Y.2005) (quoting 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1376 (3d ed. 2004)). Rule 12(e) "is designed to remedy unintelligible pleadings, not to correct for lack of detail." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 233 F.R.D. 133, 134 (S.D.N.Y.2005) (quoting *Dunlop McCullen v. Local 1–SRWDSU–AFL–CIO,* No. 94 Civ. 1254, 1994 WL 478495, at *1 (S.D.N.Y. Sept. 1, 1994)) (internal quotation marks omitted). The party seeking the more definite statement is required to point out the flaws in the pleading and the details sought. *See* Fed. R. Civ. P. 12(e).

## II. Discussion

### A. Motions to Strike

At the outset, several ancillary matters require resolution. P&G argues that most of the materials attached to Mega's motion to dismiss — which include, *inter alia*, various written communications between the parties and the termination notice (*see* Dkt. No. 19) — cannot be considered at the motion to dismiss stage and thus should be struck. (Dkt. No. 22 at 6–7.) (P&G concedes that the Agreement itself, also included in these exhibits, is integral to the complaint and thus can be considered on the motion to dismiss, even though P&G did not attach the document to its submissions. (*See* Dkt. No. 22 at 9 n.3); *see also DeSouza v. Andy Frain Servs., Inc.*, No. 12 Civ. 1308, 2012 WL 3245496, at *2 (S.D.N.Y. Aug. 6, 2012).)

Whether the Court considers these documents, however, is an entirely academic question, because the arguments raised by Mega in its opening brief in support of its motion to dismiss are purely legal arguments that are unaffected by the contents of the exhibits. *See* Dkt. No. 21 at 11–16 (arguing that the complaint fails to allege a breach of contract); *id.* at 17–20 (arguing that the breach of implied covenant of good faith, promissory estoppel, quantum meruit, and unjust enrichment claims are duplicative of or precluded by the contract claims); *id.* at 20–23 (arguing

6

that the complaint fails to allege a defamation claim); *id.* at 23–24 (arguing that the complaint fails to state a claim for fraud); *id.* at 23 (arguing that the complaint fails to state a claim for tortious interference). To the extent the arguments raised only in the *reply brief* rely on the attached exhibits, "a court should not consider arguments that are raised for the first time in a reply brief." *Aviva Trucking Special Lines v. Ashe*, No. 18 Civ. 11180, 2019 WL 4387339, at *4 (S.D.N.Y. Sept. 13, 2019) (citation omitted). The Court's resolution of this motion to dismiss is unaffected by the presence or lack thereof of the exhibits. Accordingly, the Court denies as moot the request to strike these attachments.

Next, P&G urges the court to strike Mega's reply brief. (*See* Dkt. No. 28.) The brief was both untimely and overlength. (*See id.*; *see also* Dkt. No. 26.) Moreover, Mega's delinquency followed several missed deadlines and extensions and an admonition by this Court that "[n]o further extensions of [the] deadline [would] be granted absent a showing of extraordinary circumstances." (Dkt. No. 26.) In response, Mega argues that the delay has caused P&G no prejudice and moves for an extension of the deadline and leave to file a brief in excess of the Court's page limits *nunc pro tunc*. (*See* Dkt. No. 29.)

"[D]istrict courts may grant extensions of time in purely procedural matters like these upon a showing of 'excusable neglect.'" *LoSacco v. City of Middletown*, 71 F.3d 88, 93 (2d Cir. 1995) (quoting Fed. R. Civ. P. 6(b)(2)). "'[E]xcusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of [the] movant." *Id.* (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 392 (1993)). Thus, a court may extend a lapsed deadline in purely procedural matters, "at least when the delay was not long, there is no bad faith, there is no prejudice to the opposing party, and movant's excuse has some merit." *Id.*

Here, there has been no suggestion of bad faith and there is no discernible prejudice to P&G. *See Minitti v. Speiser, Krause, Nolan & Granito, P.C.*, No. 04 Civ. 7976, 2006 WL 3740847, at *11 n.6 (S.D.N.Y. Dec. 19, 2006) (Chin, J.) ("[I]t is unclear why any [prejudice] would result from the late filing of reply papers to which [the opposing party] had no right of rejoinder."). Yet the delay was substantial (one week), and Mega's justifications for these lapses are thin. In the main, they consist of vague allusions to a busy work schedule and the burdens of juggling personal and professional obligations. (*See* Dkt. No. 29 at 2.) They are thus not perceptibly different than the everyday demands most lawyers face, most of the time. It would therefore be within the Court's discretion to strike the brief in its entirety as untimely, or to strike the overlength pages of the brief for exceeding the court's length requirements. But, again, to do so would be a purely academic exercise. The arguments in Mega's reply brief are (a) aired fully by the opening brief, (b) related to the moot issue just addressed regarding the motion to strike the exhibits, or (c) new to the reply brief and therefore not properly considered by the Court. Because the brief is therefore immaterial to the determination of the pending motions, the motion to strike the reply brief is also denied as moot and the motions to extend the deadline and for leave to file an overlength brief *nunc pro tunc* are granted.

### B. Motion to Dismiss

#### 1. Breach of Contract

On the merits, Mega begins by arguing that P&G fails to state a claim for breach of contract with respect to the First Period. "Under New York law, the elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. . . . Stating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008). Recall that the Agreement provided that if, in a

8

given period, "substantial additional hours and work bec[ame] necessary" beyond that originally budgeted, P&G agreed to "advise [Mega] promptly, explain[] the necessity of such hours and work, and obtain [Mega's] permission to extend such work prior to commencing." (Agmt at 15.) The complaint alleges that P&G worked approximately twice as many hours as were originally budgeted for the First Period, and thus, after deducting the built-in 15% cushion, more than two thousand hours of work went uncompensated. (Compl. ¶ 12.) At first blush, Mega seems to respond that the Agreement forecloses P&G's argument because the contract's terms unambiguously obligate Mega to pay only a fixed fee. (*See* Dkt. No. 21 at 12–13.) But on a closer read, it appears that Mega — like P&G — interprets the Agreement to provide that *contingent on Mega's consent*, P&G would furnish additional hours beyond those budgeted in the Agreement and would be compensated therefor. (*See* Dkt. No. 21 at 13.) On the parties' shared understanding of the Agreement, then, the question is whether P&G has adequately alleged that Mega consented to the additional hours.

The Court concludes that P&G has not done so. The complaint's only relevant allegations are that "Mega . . . consented to that extra work." (Compl. ¶ 11). But the bare assertion that Mega "consented" within the meaning of the contract is precisely the kind of "legal conclusion[] masquerading as factual" allegation that courts must disregard when deciding a motion to dismiss under Rule 12(b)(6). *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006). Nor is P&G helped by its prediction in its opposition papers that "[t]he evidence will show that [consent] is exactly what happened here." (Dkt. No. 22 at 9.) Rule 8 demands more; P&G must allege — with facts — what conduct or communications by Mega amounted to "consent" within the meaning of the Agreement. Because the complaint does not do so, the breach of contract claim with respect to the First Period is dismissed.

9

P&G has similarly failed to state a breach of contract claim with respect to the Third Period.[1] According to the complaint, Mega communicated its intention to terminate the Agreement on March 19, 2018, in the middle of the Second Period. (Compl. ¶ 17.) Sometime thereafter, Mega "advised P&G that Mega desired to continue working with P&G," which "had the effect of countermanding any effect the Notice might otherwise have had on terminating the Third Period." (Compl. ¶ 20.) Even if P&G is correct about the effect of the purported rescission of the termination under New York law (an issue the Court does not address and Mega does not seem to dispute), P&G's claim fails because it has not pleaded any *facts* that would show that Mega communicated its desire to reup the Agreement. The vague allegation that Mega "advised" P&G of its "desire[] to continue working with P&G," is again a legal conclusion dressed up as factual allegation. The breach of contract claim with respect to the Third Period is therefore dismissed.

### 2. Promissory Estoppel and Quantum Meruit/Unjust Enrichment

Mega next argues that the family of quasi-contract claims asserted by P&G — promissory estoppel, quantum meruit, and unjust enrichment — are barred because they are duplicative of, and inconsistent with, P&G's theory that the dispute is governed by a valid contract. (*See* Dkt. No. 21 at 18–19.) The Court is unpersuaded.

Under New York law, relief on these theories "is unavailable where . . . an express contract covers the subject matter." *Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 157 (2d Cir. 2012). But even if New York law precludes a plaintiff from simultaneous *recovery* under both contract and quasi-contract theories, it does not forbid pleading both claims in the alternative. *See, e.g., Transcience Corp. v. Big Time Toys, LLC*, 50

---

[1] Mega has not moved to dismiss the contract claims based on the Second Period.

F. Supp. 3d 441, 452 (S.D.N.Y. 2014) ("[E]ven though Plaintiffs may not ultimately *recover* under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to *plead* such claims in the alternative."). Moreover, the New York restriction applies "only where 'the scope of the contract clearly covers the dispute between the parties.'" *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (Sotomayor, J.) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)) (alteration omitted). Thus, "because it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments [against simultaneous quasi-contract claims] as premature." *Vertex Const. Corp. v. T.F.J. Fitness L.L.C.*, No. 10 Civ. 683, 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011); *cf. Anthem, Inc. v. Express Scripts, Inc.*, No. 16 Civ. 2048, 2017 WL 1134765, at *6 (S.D.N.Y. Mar. 23, 2017) (dismissing unjust enrichment claim where "both parties assert the [contract] is valid and enforceable and agree that the [disputed issue] is governed by the express terms of the [contract]").

Here, Mega has not conceded that the contract between the parties governs the entire dispute. Though it does not contest that there existed a valid, binding agreement during the First Period, it argues that (1) the contract's terms only covered the work until the quoted hourly maximum was exhausted and (2) the contract was terminated on March 19, 2018, and therefore does not govern the period thereafter. (*See* Dkt. No. 21 at 12–14.) Accordingly, the Court cannot say at this stage that an express contract covers the entire dispute between the parties.

### 3. Covenant of Good Faith and Fair Dealing

Mega moves to dismiss P&G's claim grounded in the implied covenant of good faith and fair dealing on the basis that it is duplicative of the breach claims. (*See* Dkt. No. 21 at 17–18.) P&G responds that the implied-covenant claim is based on Mega's "surreptitiously working behind P&G's back with its rival to subvert the contract and blame P&G without basis" (Dkt.

11

No. 22 at 10 (quoting Compl. ¶ 40)), a matter factually distinct from Mega's alleged failure to perform under the contract.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). This covenant "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Jaffe v. Paramount Commc'ns Inc.*, 644 N.Y.S.2d 43, 47 (App. Div. 1996). However, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (ellipsis in original) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). Thus, if a breach of contract claim is "based on the same facts" as an implied-covenant claim, "the latter claim should be dismissed as redundant." *Id.* Yet if "an allegation of a violation of the covenant of good faith and fair dealing alleges separate conduct from that underlying a concurrent claim for breach of contract, the two claims are not duplicative." *Joshi v. Trustees of Columbia Univ. in City of N.Y.*, No. 17 Civ. 4112, 2018 WL 2417846, at *7 (S.D.N.Y. May 29, 2018). Therefore, "[a]n implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016) (citation omitted).

Here, the implied-covenant claim is at least in part "based on allegations different than those underlying the accompanying breach of contract claim." *Id.* (citation omitted). The

complaint alleges breaches based on "(a) improperly purporting to terminate the Agreement, thereby depriving P&G of its expected benefit of the bargain; (b) obtaining P&G's most sensitive items under false pretenses and then secretly sharing [the] same with P&G's competitor Navigant; (c) surreptitiously working behind P&G's back with its rival to subvert the contract and blame P&G without basis; and (d) intentionally acting to cost P&G business with other clients." (Compl. ¶ 40.) Though (a) is plainly duplicative of the breach-of-contract claims, (b), (c), and (d) are based on distinct allegations. Because there is an independent basis for the implied-covenant claim, the motion to dismiss is denied as to that claim.

### 4. Fraud

Mega next moves to dismiss P&G's fraud claim. Under New York law, "[t]he elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016) (internal quotation marks omitted and formatting altered). "[T]o maintain a claim of fraud" alongside a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, . . . or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

Mega's sole argument with respect to the fraud claim is that P&G has failed to allege a legal duty separate from the engagement agreement. (Dkt. No. 21 at 23.) But the thrust of P&G's fraud theory is not that the promissory statements that Mega made in the Agreement were fraudulent; rather, P&G alleges that during the course of its performance of the contract, Mega

13

stated that P&G's workpapers were required by Mega's management (a material misrepresentation), in order to obtain those papers and injuriously disclose them to Navigant. (Compl. ¶¶ 73–74.) The allegations supporting the fraud claim are therefore collateral or extraneous to the contract. P&G's fraud claim may thus coexist with P&G's contract claims.

### 5. Tortious Interference with Contract

Mega's next attack on the complaint pertains to P&G's claim for tortious interference with contract.[2] "Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third[]party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citation and internal quotation marks omitted).

Mega claims that "P&G fails to allege exactly how Mega 'intentionally induced' Hua-Nan and others to breach their contracts with P&G, and by what 'wrongful means'." (Dkt. No. 21 at 24.) As to those elements, Mega avers, the complaint offers only "labels and conclusions" and a "formulaic recitation of the elements of a cause of action." (*Id.* (citation

---

[2] The heading of this section of Mega's briefing refers to "tortious interference" without distinguishing between what the complaint refers to as the "interference with contract" claim and the "interference with pecuniary advantage" claim, and the section concludes by stating that "P&G failed to state a cause of action on its tortious interference claim*s*." (Dkt. No. 21 at 24 (emphasis added)). But the gravamen of the briefing goes only to the interference with contract claim. (*See id.*) Nonetheless, the Court is unaware of a doctrine of "tortious interference with pecuniary advantage," and P&G provides no authority for the doctrine purportedly supporting this cause of action. Even if the pleadings were construed to assert a claim for tortious interference with *prospective business* or *economic advantage*, though, they would still fail. P&G has not alleged any facts in service of this claim beyond those alleged with respect to interference with contract claim and does not allege in non-conclusory terms any injury to a business interest apart from the termination of the Hua Nan contract. *See, e.g., Moynihan v. New York City Health & Hosps. Corp.*, 993 N.Y.S.2d 260, 265 (App. Div. 2014).

14

omitted and internal quotation marks).) Mega is partially correct. To the extent the complaint alleges interference with contracts with "other P&G customers" apart from Hua Nan, those allegations are wholly conclusory and thus insufficient to withstand a motion to dismiss. (Compl. ¶¶ 30, 79, 81.) But the allegations regarding interference with Hua Nan are relatively detailed: On or around October 15, 2017, Mega knowingly communicated false statements regarding P&G's business practices — namely, that P&G did not customize its audit programs or reports and did not receive management input in assigning target dates — to Hua Nan Bank's New York branch. (*See* Compl. ¶¶ 27, 29.) Those statements caused Hua Nan to repudiate its contract with P&G. (*See* Compl. ¶ 29.) Knowingly false "[d]isparagement [that] impugn[s] the basic integrity . . . and competence of [a] business" is more than sufficient, under New York law, to show the requisite culpability to sustain a tortious interference claim. *John Langenbacher Co. v. Tolksdorf*, 605 N.Y.S.2d 34, 35 (App. Div. 1993); *see also Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 495 (App. Div. 2009). Accordingly, P&G has adequately stated a claim for tortious interference with contract.

### 6. Defamation

Next, Mega challenges P&G's defamation claim, asserting that the complaint does not adequately plead defamation because the allegations are too vague and conclusory to survive a motion to dismiss. (*See* Dkt. No. 21 at 20–22.) The Court disagrees.

Under New York law, "defamation" encompasses "the twin torts of libel and slander." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 839 (App. Div. 1982)). P&G's complaint seeks to hold Mega liable for written statements and thus its claim sounds in libel. *See id.* To survive the motion to dismiss its libel claim, P&G must allege five elements: "1) a written defamatory statement of fact concerning [it]; 2) publication to a third party; 3) fault . . . ; 4) falsity of the defamatory statement; and 5) special

damages or *per se* actionability." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). A statement is defamatory *per se* if it "tend[s] to injure [the plaintiff] in his or her trade, business or profession." *Stern v. Cosby*, 645 F. Supp. 2d 258, 273 (S.D.N.Y. 2009) (Chin, J.) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).

Mega does not challenge P&G's allegations as deficient with respect to any particular element of the claim, but rather argues more generally that "[a] defamation claim is only sufficient if it adequately identifies the purported communications, and an indication of who made the communication, when it was made, and to whom it was communicated." (Dkt. No. 21 at 20 (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012).) P&G, Mega complains, has therefore failed to articulate its complaint with the requisite specificity. Again, however, the allegations with respect to Hua Nan are sufficiently detailed to withstand the motion to dismiss. Though not alleging the very hour or minute that the communications were made, nor the particular employees involved, the allegations regarding the dates, corporate entities, and contents of the communications "afford defendant sufficient notice of the communications complained of to enable [it] to defend [it]self." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986).

Mega also urges the Court to dismiss the defamation claim because Navigant, rather than Mega, originated the allegedly libelous statements. (*See* Dkt. No. 21 at 22.) But under longstanding principles of New York law, "where words are spoken to one person and he repeats them to another, in consequence of which the party of whom they are spoken sustains damages, the repetition is, as a general rule, a wrongful act, rendering the person repeating them liable in like manner as if he alone had uttered them." *Terwilliger v. Wands*, 17 N.Y. 54, 57 (1858); *see also Biro*, 883 F. Supp. 2d at 461 ("[T]he Second Circuit has expressly embraced the 'widely

16

recognized' rule that 'one who republishes a libel is subject to liability just as if he had published it originally." (quoting *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60–61 (2d Cir.1980)).  That the allegedly defamatory statements originated with Navigant, then, does not negate Mega's liability for their alleged repetition.

### C. Motion for a More Definite Statement

Finally, the Court denies Mega's motion for a more definite statement in its entirety. Rule 12(e) requires that a movant "point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e).  Mega provides no argument in support of its motion whatsoever, instead simply appending the request for a more definite statement to its briefing otherwise entirely oriented toward defending its Rule 12(b)(6) motion.  Accordingly, Mega has not carried its burden under Rule 12(e), and the motion is denied.

## III. Conclusion

For the foregoing reasons, Mega's motion to dismiss is GRANTED in part and DENIED in part.  Its motion for a more definite statement is DENIED.  P&G's motions to strike Mega's exhibits and reply briefs are DENIED.  Mega shall file an answer to the remaining claims on or before October 21, 2019.

The Clerk of Court is directed to close the motions at Docket Number 18.

SO ORDERED.

Dated: September 30, 2019
       New York, New York

_____
J. PAUL OETKEN
United States District Judge